UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ISRAEL PEREZ, MAGDALENO ESTRADA
ESCAMILLA, on behalf of themselves and all
other Mexican/Chicano Day Laborers and/or
Latino Day Laborers similarly situated,

                                     **Plaintiffs**

**DEFENDANT'S
MEMORANDUM OF
LAW IN OPPOSITION
TO PLAINTIFF'S
MOTION FOR
SUMMARY
JUDGMENT**

CHRISTOPHER SLAVIN AND
RYAN WAGNER,
                           **Defendants.**
-----------------------------------------------------X

Index #: CV-6201

LONG ISLAND OFFICE

## OPENING REMARKS

In this case the Court is called upon to determine a variety of complicated indeed intriguing issues, some of which are constitutional in dimension. And, while the Defendant, Christopher Slavin has admittedly been convicted of various crimes this Court will, based upon a full fleshing out of the pertinent authority and disclosure of the facts, easily conclude that Plaintiffs have not met their burden insofar as that which is necessary to entitle them to the drastic remedy they seek. Infirmities, ranging from the lack of real *"identity of issues"*, to significant questions *vis a vis* the fairness of the proceeding that led to the Defendant's conviction, make clear that Plaintiffs' summary judgment application is, at best, strained. Equally true, is that a straight forward application of the law surrounding Summary Judgment (and Rule 56) to the Complaint filed herein, tips the balance decidedly in favor of Defendant's due process right to a trial on the merits. Then, of course, there are the questions raised by the

1

Defendants' counter-claims.  This Court will also see that there exists in this matter a disturbing reality, that being, the forensic and scientifically established facts proven at the Defendants criminal trial flatly and unequivocally contradict the testimony of the two Plaintiffs given at the same proceeding.  Defendant asserts that as a result of the manifest incongruities existing between the testimony of the Plaintiffs and the facts established by empirical and scientific methods, only one conclusion can be drawn; that the Plaintiffs, for reasons of their own and not disclosed at trial, lied or otherwise misrepresented the events that transpired on September 21, 2000.  Defendant contends that as the result of the intellectually disingenuous statements made by the Plaintiffs, when taken together with the flood of impermissible and inflammatory evidence, substantial questions of fact are raised that not only require a denial of Plaintiff's motion, but a trial on Defendant's counter-claims.

Finally, whenever this case is, even casually, discussed there is the almost concomitant reference to tattoos.  This action is no different.  As this Court will learn first hand, the criminal trial of this Defendant was corrupted, even polluted, by a flood of irrelevant, prejudicial and unconstitutionally obtained evidence relating to the existence of body markings that, while shielded from public view and not observed by either Plaintiff, were introduced against the Defendant during the course of his trial.  Critical to this motion is that they (the tattoos), after being obtained under the guise of corporeal evidence were introduced as motive/intent evidence and their existence, admissibility, relevance and materiality are questions properly  before the Court. Inasmuch as Plaintiffs rely, almost exclusively, upon them to establish a variety of facts essential to their claims, it is obvious that this Court, like the Trial Court, the Appellate Division and the New York Court of Appeals, is confronted with questions relating to admissibility and the legitimate evidentiary value of the proposed evidence.

At this point I can confidently, and without hesitation, proclaim that there was no rational justification for permitting the introduction of the evidence at Defendant's criminal trial and that the evidence was, and remains, irrelevant, immaterial and unconstitutionally obtained. Accordingly, based upon the arguments hereinafter presented, this Court will be urged to bar their introduction here. How these questions weigh in on Plaintiffs' summary judgment motion is an open question, however, it is readily apparent that Plaintiffs, in support of their instant motion, have rested their case on this evidence in making argument case *vis a vis* motive and intent. Accordingly, the issue is properly addressed here as an *in limine* evidentiary consideration. The question that I suppose begs for an answer is, in the event this Court determines, as an evidentiary or constitutional matter, the evidence to be flawed or otherwise improper, will that determination, in turn, require a trial on the merits and the Defendant's counter-claims. I submit that a review of the precedent relied upon by the Defendant is both applicable and prevailing and supports the contention that Plaintiffs motion is, in any case, destined for denial.

Equally true, is that the Plaintiffs' entire motion for summary judgment seeks to impose a collateral estoppel bar to review on issues that were not even theoretically related to the issues presented in Defendant's criminal trial.

For instance, by their motion, Plaintiffs seek a summary judgment determination that the *"Defendants did enter into a conspiracy in violation of 42 U.S.C. 1985 for the purpose .... Depriving members of the class their constitutional rights under the First, Thirteenth, and Fourteenth Amendments... and their statutory rights under 42 U.S.C. 1981 and 1985 and that the conspiracy was entered into for the purpose of intimidating and creating a climate of fear".*

3

Simply stated, this issue was not so much as mentioned during the course of Defendant's criminal trial nor was it contemplated by any of the counts in the indictment upon which the Defendant's conviction rested. (Exhibit "A").

This same infirmity applies to virtually every cause of action set forth in the Complaint. (Exhibit "B").

As is more fully discussed hereinafter, it is readily apparent that in the context of the complaint upon which Plaintiffs seek summary judgment, they are simply not entitled to it as a matter of law.

Likewise, the complaint also sets forth numerous causes of action including far reaching and speculative allegations against the two named Defendants alleging acts perpetrated against Plaintiffs and "*all other Mexican/Chicano Day Laborers and Latino Laborers similarly situated*". For example, the Fourth cause of action, (see page 15 of Defendant's complaint annexed hereto as Exhibit "B") alleges that Defendants deprived the Plaintiffs of their right to be free from the "*badges and incidents of slavery*", a right guaranteed by the 13th Amendment. The Plaintiff's now move for "*partial summary judgment*" *vis a vis* liability on this and the other causes of action set forth in the Complaint. Conspicuously absent from Plaintiff's memorandum of law (which relies solely on the doctrine of collateral estoppel) are the particular causes of action for which the Plaintiffs now seeks "*partial summary judgment*". Inasmuch as the Plaintiffs have placed this Court (and the Defendants) in the precarious position of having to sort through the numerous causes of action, attempting to speculate the exact nature of the application (and laboring to qualify and quantify their argument) this office is left with one alternative, to address each cause of action singularly, *in siriatum*. However, before addressing the specific causes of action, a general discussion of Defendants' position on the law surrounding

4

rule 56 is called for.

## GENERAL PRINCIPLES AND CONTEXT

## OF DEFENDANT'S ARGUMENT

### I.   The Doctrine of Collateral Estoppel is not

### Available to the Plaintiffs

It is a well settled and eminently sensible proposition that collateral estoppel is " *premised on the basic concept of fairness*" protecting parties from having to "*re-litigate identical issues*".  However, collateral estoppel must accommodate due process concerns and cannot "*be used against a person who did not have a fair opportunity to litigate an issue decided in a previous proceeding*".  Therefore, before being available to one seeking summary judgment, two "*formal*" requirements must be met.  First, there must be a full opportunity to litigate the decision asserted to be controlling and second, the issue in the prior action must be identical and decisive of the issue in the instant action. *Zois v. Cooper* 268 B.R. 890 (S.D.N.Y.2001); citing *Parklane Hosiery Co., Inc. v. Shore* 439 U.S. 322 and *Gilbert v. Barbieri* 53 N.Y.2d 285 (N.Y.Ct, App 1981).

Here, the complaint upon which the Plaintiff's seek summary judgment lacks any resemblance to the indictment, the testimony or the issues determined at the criminal trial and the ultimate verdict reached by the Jury, is not "*decisive of the issues*" being litigated on the complaint [*Emich Motors v. General Motors, infra*].

Even if we assume arguendo ALL of the facts as set forth in the complaint to be true, nothing alleged speaks to issues such as whether or its "*First, Thirteenth and Fourteenth amendment rights*" were intentionally violated nor are questions connected to the equal

5

protection.... *"enjoyed by white persons"* answered by the criminal conviction.[1] Even more of a stretch are those causes of action (Exhibit "B"- counts1, 2, 3, 4, 5, 6 & 9) that assert a *"conspiracy"*, *"false imprisonment"* and *"infliction of grave mental distress"*.  None of these issued were even tangentially decided in the criminal proceeding which, in turn, logically excludes collateral estoppel as a method of obtaining summary judgment [*N.Y. v. Hendrickson Brothers*, et al 840 F.2nd 1065 (2nd Cir.1988)].

In Hendrickson, a case relied upon by the Plaintiffs, this circuit declared *"a prior judgment of conviction may be used as Prima facie evidence in a subsequent civil suit only with respect to matters of fact or law necessarily decided by the conviction and the verdict on which it was based"* [*id* @1081 citing *Emich Motors Corp. v. GM Corp*. 340 U.S. 558, 559 (1951)]. Defendant contends that by application of this well settled rule to the matter at hand, Plaintiff's motion and the arguments upon which it is based are revealed to be weak and unpersuasive.

In the instant matter it cannot, even philosophically, be said that the conviction and verdict relied upon by the Plaintiffs *"necessarily decided"* any First, Thirteenth or Fourteenth Amendment Questions.  Accordingly, based upon the complaint and the issues arising there under, collateral estoppel is simply not available to the Plaintiffs [*Commissioner of I.R.S. v. Sunnen* 333 U.S. 591 (1948) holding that collateral estoppel applies only to matters involving *"redundant Litigation"*].

In light of the disparate allegations set forth in the complaint *vis a vis* the criminal conviction, and remembering that summary judgment is only appropriate when *"the moving party establishes that there is no genuine issue as to any material fact or allegation and is entitled to the relief as a matter of law"*, Plaintiffs motion must fail.  Likewise, employing a

---

[1] The Plaintiffs have not included in their motion any certified transcript that supports any of their contentions choosing rather to rely on reported decisions involving one of the Defendants.

6

reciprocal analysis that requires "*all doubts be resolved in favor of the party opposing the motion*" Plaintiff's motion for summary judgment borders on spurious [*Fed. R. Civ. Pro Rule 56. Migra v. Warren City School Board*, 465 U.S. 75 (1984); , *Gelb v. Royal Globe Ins.*, 798 F.2d 38 (2nd Cir. 1986); *S.E.C. v. Everest Management*, 466 F.Supp. 167 (S. D.N.Y. 1979)].

## THE ISSUES RAISED BY PLAINTIFFS ARE
## NOT SUITED TO DETERMINATION BY
## SUMMARY JUDGMENT MOTION

Inasmuch as the Lion's share of Plaintiffs complaint deals with issues that were unconnected to the verdict upon which they so heavily rely, the summary judgment question is easily dispatched. Readily apparent disparities such as divergent issues and parties.[2] logically restrict any imposition of a collateral estoppel bar militating denial of the motion.

However, another defect prevalent throughout Plaintiffs memorandum of law relates to the supposition that the Defendant's tattoos supply the "motive" and "intent" elements necessary to establish many of their claims. Defendants are misguided on the facts and the law.

Throughout their memorandum, the Plaintiffs, in their attempt to settle a question of fact, cite the N.Y. Court of Appeals' decision describing the tattoos that appear on the Defendant Slavin's body. Leaving aside, for the moment, the Defendant's Fourth, Fifth and Sixth Amendment claims insofar as the gathering of that evidence is concerned, the fact remains that all of the testimony pertaining to the tattoos was elicited from a purported "expert" whose credibility was the source of much debate. What stock the jury put in the witnesses testimony, God only knows, but, it was clearly a credibility question.[3] Defendant asserts that since "*intent*"

---

[2] The Defendant was not charged, never mind convicted, of any crime relating to "*all other Mexican/Chicano Day Laborers and/or Latino Day Laborers*" as alleged in the complaint.

7

questions, which are replete throughout the complaint (i.e. "conspiracy" for thus and such a "purpose"), they are of an ilk can only be resolved at trial.

The prevailing and applicable authority clearly supports the premise that questions of intent and motive are rarely, if ever, the proper subject of summary judgment motions [*Schoenbaum v. Firstbrook*, 405 F.2d 215 ( 2nd Cir., 1968); *Friedman v. Meyers*, 428 F.2d 435 (2nd Cir. 1973)].

Here, by asserting in the complaint the existence of a "*conspiracy*" for a " *particular purpose*" the Plaintiffs are insinuating a motive and intent something " *not ordinarily subject to summary judgment*". Moreover these questions were most certainly not adjudicated in the criminal proceeding. Inasmuch as most of the allegations set forth in the complaint depend on the determination of these elements (motive/intent) and these issues were not "*distinctly put into issue and directly determined at the criminal trial*" Defendants assert them to be beyond the reach of summary judgment [*Emich Motors v. G.M.*, 340 U.S. at 569 (1951)].

**Due process requires the matter proceed to trial inasmuch as there is no existing Determination *vis a vis* the class asserted by Plaintiffs.**

By their motion, Plaintiff's assert that the underlying criminal conviction provides a collateral estoppel bar to re-litigating those issues already determined in the prior proceeding. However, an analysis of the complaint in comparison to the indictment and verdict had therein discloses a discrepancy fatal to the Plaintiff's instant motion [*Goodridge v. The Harvey Group*, 728 F.Supp. 275 (S.D.N.Y. 1990)].

Mentioned earlier, it is well settled that in order to raise collateral estoppel as a car to re-litigation there must, as a matter of law exists A) identical issues, B) that there exists sufficient

---

[3] Plaintiffs have included this expert on their witness list – Det. L. Jordon.

nexus or privey between the parties to the action in question and the prior determination thought to be dispositive, together with a full and fair opportunity to litigate [*Gilberg v. Barbieri*, 53 N.Y.2d 285 (N.Y. Ct. App. 1981); see also *People v. Berkowitz*, 50 N.Y.2d 333, 344 (N.Y. Ct. App. 1980)]. Here, the Plaintiffs' cause of action asserts, as a general matter, that Defendant's engaged in conduct that harmed and otherwise damaged "*Mexican/Chicano Day Laborers and/or Latino Day Laborers*" something that as a procedural and empirical fact was not previously litigated. And, while ordinarily the rule requiring "*mutuality of estoppel*" is no longer viable, under this situation it is clearly applicable.

Equally true is that the allegations sought to be determined by summary judgment are of a kind that do not lend themselves to dispositive motions. It is a settled proposition that issues pertaining to "*knowledge, motive and intent most often result in a full trial with a jury being able to observe the demeanor of the witness and judge for themselves issues regarding credibility and intent*" [*Schoenbaum v. Firstbrook*, 405 F.2d 215 (C.A.2d 1968)]. Believing that summary procedures should be uses "*sparingly*" in cases where "*motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators and hostile witnesses thicken the plot*" both State and Federal Courts are justifiably reluctant to extend summary determination to cases hinging on motive. Clearly, in the context of the complaint had herein these principles are squally applicable [*Poller v. C.B.S.*, 368 U.S. 464 (1962); *Cross v. U.S.*, 336 F.2d 431 (2nd Cir.2d 1964); See also *Subin v. Goldsmith*, 224 F.2d 753 (2nd Cir. 1955)].

For the reasons set forth hereinabove the Defendant's assert that since there was no prior determination *vis a vis* the class asserted due process requires a trial on the merits [*Emich Motors Corp. v. G.M. Corp.*, 340 U.S. 558 at 569].

Accordingly, based upon the complaint and the allegations set forth therein summary

9

judgment is not available to the Plaintiffs.

### **The underlying criminal conviction should not be dispositive in this litigation**

The evidentiary questions presented to this Court emanate from a relatively simple set of undisputed facts.

On November 2, 2000, the Defendant, accompanied by Counsel, presented himself to the office of the District Attorney for the County of Suffolk, State of New York.  He was immediately arrested for his role in an assault that occurred on September 17, 2000 in Farmingville, a surburb in Suffolk County, New York.  At the time Defendant was delivered over to the authorities, no warrant had been issued for his arrest nor had an indictment been handed up by a Grand Jury. Importantly, prior to actually presenting Defendant to the office of the District Attorney, retained Counsel advised the authorities, in writing, that the accused was invoking his various Fifth Amendment privileges.  Thereafter, while at the office of the District Attorney, defense counsel expressly rejected request by the Prosecutrix for what are, in New York, commonly referred to as "*voluntary exemplars*", specifically, photographs of Defendant's body which had affixed thereon, by way of tattooing, images, acronyms and symbols.  During this introductory stage of the proceeding two requests made by the prosecutrix for "*voluntary exemplars*" were unequivocally denied by defense counsel.  Moreover, on each occasion the authorities were advised that the gathering of any corporeal evidence would only be permitted by application of, and in accordance with, New York Criminal Procedure Law 240.40 (2)(b)(iv), New York State's Corporeal Evidence Statute.[4]

However, despite these admonitions, the Defendant, after the departure of Counsel, was forced to strip and have his body repeatedly photographed.[5]

---

[4] N.Y.C.P.L. 240 (2)(b)(iv) provides, "*subject to constitutional limitation*" the people may obtain pursuant to order, "*non-testimonial evidence*".

10

In reaction to Defendant's threshold Fourth, Fifth and Sixth Amendment challenges to this unlawful gathering of evidence, the People moved, pursuant to the corporeal evidence statute, for an order that would require the Defendant to remove his clothing for the purpose of photographing the expressive tattoos appearing on his stomach, chest, upper arms and legs, all shielded from public view by ordinary, every day attire.

The Defendant opposed the People's motion and raised, *inter alia,* the Fifth Amendment's self- incrimination clause as a defense to the forced exhibition of the tattoos, some of which were undeniably anti-Semitic, while others could be considered "*white supremacist*" and still others evince a counter culture lifestyle and disdain for the police. The Trial Court granted the People's application and, pursuant to court order, a second set of photos were taken and ultimately introduced against the Defendant at his criminal trial.

Critical to the Defendant's Fifth Amendment reasoning advanced by the Defendant were two uncontroverted facts. First, no witness to the crimes alleged observed the tattoos in question and their existence was irrelevant and immaterial, as a matter of fact and law, *vis a vis* identification, appearance or physical condition of the accused. Second, the evidence was sought, and later admitted at Defendant's criminal trial, for their testimonial value, in a communicative context and for the sole purpose of proving to the jury the Defendant's subjective thought process on the issues of race and religion. The Defendant contends that under these novel and unique circumstances, the State, by forcing the Defendant to reveal the tattoos for the singular purpose of establishing his thoughts and beliefs, violated Defendant's Fifth Amendment privilege against self-incrimination.

As is more fully discussed hereinafter, the Defendant, relying on *Schmerber v.*

---

[5] Like the dissent at the Court of Appeals, Defendant contends the forced strip of him constituted the coerced gathering of testimonial evidence, obtained after the entry of counsel, not a routine booking procedure.

_California,_ 382 U.S. 757 (1966), _US. v. Gilbert,_ 388 U.S. 288 (1967), and _U.S. v._
_Wade,_ 388 U.S. 218 (1969), advanced he contention that since the evidence, obtained by
coercive judicial edict, was  neither sought nor introduced to establish an empirical fact,
physiological response or identity, but rather, obtained and admitted into evidence for the stated
purpose of establishing the accused's thoughts and beliefs, the Fifth Amendment privilege,
unlike other corporeal evidence cases, was implicated.

Defendant readily concedes that typically, corporeal evidence is, almost by definition,
non-testimonial. However, as seen here, and considering that people are not born tattooed, this
presumption is not an absolute. It was, until this case, axiomatic that corporeal evidence is
constitutionally obtainable and admissible so long as it relates to the proof of an empirical fact
such as identity, physical appearance or to establish a physiological response. _Holt v. US.,_ 218
U.S. 245, 252, 253 (1910). Free from the risk that the accused's thoughts or beliefs will, by
State action, be compelled from him and remain his own, traditional corporeal and
forensic evidence is essential to modern day prosecutions and, as the Supreme Court
reasoned in _Schmerber, supra, "that since blood evidence was neither Defendant's_
_testimony nor evidence relating to some communicative act or writing by Defendant,_
_the privilege was not implicated", Id._ 765.

At trial, and before the intermediate Appellate Court, the people relied on an
exceedingly narrow reading of _Schmerber_ to justify the issuance of a Court order that compelled
the Defendant to reveal the tattoos, enabling them to be photographed and subsequently admitted
into evidence against Defendant as proof of his subjective thoughts and motive. The Trial Court
also adopted this narrow view when it refused to acknowledge the testimonial nature of the
evidence.  The intermediate Appellate Court passed on the issue without comment.

12

On June 11, 2003, Chief Judge Judith Kaye granted leave to argue the matter before the New York Court of Appeals.

In his brief to the New York Court of Appeals, the Defendant, still guided by the holdings of *Schmerber*, *Gilbert*, and *Wade*, asserted that since the evidence was obtained and offered to establish the accuseds philosophic ideology and motive for having committed the crimes charged, as opposed to empirical facts, as opposed to empirical fact, phsiological response or identity, the evidence itself constituted a departure from the realm of corporeal evidence and entered that which is testimonial and communicative, something jealously guarded by the Fifth Amendment's self-incrimination clause. *Ullman v. U.S.*, 350 U.S. 423, 426, 428 (1956).

In their brief to the New York Court of Appeals, the People responded that, since the State did not compel. The Defendant to inscribe himself, the holding of U.S. *v. Hubbell*, *530 U.S.* 27 (2000), and document related cases like it, were controlling and analogous. The People also contended that, since the tattoos pre-existed, by many years, the order requiring them to be displayed, "*act of production doctrine*" considerations were not violated. The Defendant disagreed. Arguing that the compelled exhibition of the tattoos evinced a reaffirmance of their socio-racial and political overtones and that, since it was the Defendant's own body, not a document whose source could be hidden from a jury, the compelled display was, in the context of the self incrimination clause, an independent and coerced testimonial act. The Defendant also contended that, since it was only by court order that the evidence (the photos) was created, that Defendant, even under *a Hubbell* approach, was forced to assist in the creation of evidence as opposed to the mere surrender of evidence. Pointing to the obvious distinction between delivering a pre-existing document pursuant to subpoena and the patent invasion of personal privacy that accompanies the forced stripping of an accused for the purpose of taking

13

photographs of his or her body, The Defendant claimed this Court ordered procedure violated a host of constitutional and evidentiary considerations. Finally, Defendant asserted that in the context of the case, the photos, being of Defendant, required him to self authenticate the tattoos and, most importantly, what they were purported to represent.

In a four-two decision rendered on February 17, 2004, a divided New York Court of Appeals adopted the People's view, holding that despite being despite being irrelevant and immaterial as corporeal evidence and while acknowledging the testimonial qualities and communicative nature of the evidence, the State, by application of *Hubbell* and its progenitors, was entitled to constrain the accused to remove his clothing, display the tattoos, be photographed, and have the photos admitted into evidence to establish his thoughts and beliefs on the issue of race and motive for committing the crimes charged.

In a sharply worded dissent, Judge Ciparick, joined by Chief Judge Kaye, called the majority's *Hubbell* analogy "*dubious at best*".  Defendant agrees.[6]

### The Criminal Proceeding was tainted and should not be considered dispositive

The Fifth Amendment provides *"No person.. shall be compelled in any criminal case to be a witness against himself."* Historically, the Courts have surveyed the boundaries of the privilege and bench marked its dimensions by the *"testimonial character"* and *"communicative and personal nature"* of the disputed evidence that, when combined with the *"ingredient of personal compulsion"*, provides the longitude and latitude necessary to navigate the course originally plotted by the framers. *Counselman v. Hitchcock*, 142 U.S. *547* (1896).

---

[6] Aside from the tattoos photos and testimony directly relating thereof, the record is barren of any evidence supporting the conclusions that the crimes charged were race, gang, white supremacist or hate group related or that the crimes were contrivances emanating from having such belief or membership in such groups.  Yet, despite this being so, the tattoos were employed to create the inference that the Defendant belonged to such groups as "*prison gang*", "*street gang*", "*white supremacist groups*" and worse.  Most importantly however, the evidence was used as evidence of the Defendants subjective thought and to supply a racial motive to the crimes charged.

14

In the matter being considered, by misapplication of the Supreme Courts determination in *Hubbell, supra,* the New York Court of Appeals has blurred, even erased altogether, the line that once separated corporeal and incorporeal evidence. The Defendant contends that this stealthy transgression, and degradation of the privilege, only serves to encourage the government's *"ever more ingenious methods of obtaining access to sought after materials "*, and cannot withstand critical, historical, philosophic or even logical scrutiny. *Couch v. U.S.,* 409 U.S. 322, 342 (1973), *U.S. v. White,* 322 U.S. 695, 698, 699 (1944).

Undoubtedly, the burning question presented (which parenthetically, neatly fits the criteria of Justices Thomas and Scalia's invitation appearing in their appended opinion in *Hubbell, supra* and that which appeared in Justice Marshall's dissent in *Pennsylvania V. Muniz, infra* at fn 4) is whether the Fifth Amendment privilege protects against compelled production (or creation) of incriminating evidence or, is it wholly exclusive to that which is testimonial and, if not, under what authority can the State extort evidence, testimonial or otherwise, directly from the accused and still remain within the recognized purpose and policy behind the privilege.

It is respectfully submitted that a review of the salient facts, as simple as they are, will cause this honorable Court to conclude that the conviction below was not fairly obtained and therefore it would inappropriate to consider it dispositive of the complaint.

Admittedly, the thorniest questions raised by the facts is what type of evidence created when the Trial Court, via coercive judicial edict, ordered the Defendant to disrobe and be photographed.

Perhaps, the simple answer is corporeal evidence.  However, in this extraordinary case, the simple approach reaches the wrong conviction. Here, the constitutional axiom that the evidence relate to some empirical consideration, i.e. identity, appearance or physical condition, is

absent. In this case the evidence was sought, and obtained by coercive judicial edict, for the singular purpose of compelling from the accused his thoughts and beliefs as reflected in the expressive tattoos found on his body. Importantly, the evidence was obtained, and later admitted at trial, as proof of Defendant's "thinking"[7] not as "real" or "physical evidence". Moreover, there is no doubt that what was obtained from Defendant is most accurately described as *"testimonial evidence"*, offered to the jury in a communicative context, for the imprecise, but intended purpose of establishing Defendant's subjective thoughts, beliefs and motive. *Doe v. U.S.,* 487 U.S. 201, 210, *(1988), Curcio v. U.S.,* *354* U.S.118, *128* (1957). The problem is, the evidence was obtained by virtue of New York's corporeal evidence statute and this Court's well defined corporeal evidence exception. This dilemma cannot be logically reconciled and constitutes the forced fitting of a square peg into a round hole.

In *Schmerber v. California, supra,* the Supreme Court, while addressing the Fourth and Fifth Amendment implications emanating from the issue of corporeal evidence, concluded that *"the privilege of self incrimination protects an accused only from being compelled to t e s t , or from otherwise providing the state with evidence of a testimonial or communicative nature" Id. 764.* The Court likewise concluded *"It is clear that the protection reaches an accused's communications, whatever form they might take, and the compulsion or responses which are also communication"* and, so long as there does not exist *"even the shadow of testimonial compulsion"* the privilege is not triggered. (emphasis added) *Id. 764-766.*

In this case, the Trial Court ordered an accused to provide testimonial evidence that was subsequently offered for its communicative value, absent the justification or requiring the evidence speak to any corporeal issue whatsoever.

---

[7] In her opening statement the prosecutrix while admitting the evidence had no empirical value and was irrelevant to the question of identity stated it will establish the Defendant's *"motive... his thinking"*

16

Moreover, since the evidence itself was utterly immaterial and irrelevant as traditional exemplars, its relevance and materiality was limited by the facts to incorporeal matters, such as thought and belief. As opposed to the mere exhibition of his person for identification purposes, in this case, the Trial Court forced the accused to reveal his person so that communicative and testimonial evidence could be obtained directly from him and, to some extent, as the byproduct of a coercive judicial edict, be created by him. And, although requested and obtained under the guise of corporeal evidence, what was actually obtained were insights into the purported *"inner sanctum of personal feeling and thought" [Couch v. US., 409 U.S. 322, 377(1973)]* and as such should have been protected. That much is clear.

To put a finer point on Defendant's initial Fifth Amendment claim, the Court should note that aside from the images and symbols referred to by the majority at the Court of Appeals, and relied upon by Plaintiffs, at least three of the tattoos in question, "F.T.W.", "A.C.A.B." and "N.Y.H.C.", are acronyms for actual words and expressive thought. What is most troubling however, is that the Trial Court, after the photos were admitted into evidence, permitted the State to present testimony as to the meaning of these acronyms'. Ignoring, for the moment, the danger that exists when law enforcement is left to speculate or select what words are to be put into the mouth of an accused in a criminal trial, the fact remains that actual words were attributed to the Defendant and those words were obtained, by force, *via* coercive judicial edict. The Fifth and Sixth Amendment implications that resonate from this scenario are virtually endless.

---

' F.T.W., ~~"Fuck the World"~~ while A.C.A.B. stood for "All cops are bastards." N.Y.H.C, New York Hard Core".. was said to indicate an association with a group known as "New York Hate Corps." or

In each of the seminal cases decided that deal with an accused's compulsory submission to exemplar orders, the Courts, both State and Federal, reiterate the sentiment that *"mere exemplars, in contrast to the content of what is said",* are nothing more than *"identifying physical characteristics." Doe v. U S, 487* U.S 201, *210, 211 (1988), U.S v. Wade, 388* U.S. 218, *222 (1967).* It is readily apparent that, when choosing to frame underlying rationale behind the corporeal evidence exception in the context of *"identifying physical characteristics",* the Supreme Court intended any search or forced exhibition to be related, at least in some measure, to an identification, empirical or corporeal matter in controversy. For instance, in *US. v. Wade, supra,* the Court reiterates itself by opining *"the accused was required to use his voice as an identifying physical characteristic, not to speak his guilt." Id.* 222-223. Here, there was no nexus between the forced exhibition of the body and a related question of empirical fact. It was, as a matter of record, made clear that this evidence was only relevant to establish the Defendant's subjective thoughts and beliefs. These two propositions cannot, even theoretically, be squared. Here, the evidence was, by the State's own admission, sought after to establish the accused's *"self-identification with white supremacist ideology",* to establish Defendant's *"general racial animosity"* or, as told to the jury by the prosecutrix, to establish Defendant's *"thinking".* It was reasoned by the People that, once Defendant's religious, socio-racial and political beliefs were established, the jury would infer a racist motive to the crimes charged. By advancing the contention that anyone who has inscribed himself with these symbols of hatred possessed the requisite mental state to commit murder, the People used the evidence obtained, not to establish guilt as an empirical matter but rather, as a subjective admission, or as the Supreme Court has phrased it, to *"speak his own guilt" US. v. Wade, 388 U.S.* at

18

223. Defendant Slavin asserts that this scenario cast the *"shadow of testimonial compulsion"* specifically warned against in <u>*Schmerber v. California*</u>, 382 U.S. at 765. Accordingly, the entire proceeding was grounded upon a glaring Fifth Amendment violation.

In <u>*U.S. v. Gilbert*</u>, 388 U.S. 263, 265 (1967), the Supreme Court presaged the problems we have now encountered. When discussing the justification behind excepting corporeal evidence from Constitutional protection, Justice Brennan notes that *"no claim is made that the content of the exemplars was testimonial"*, suggesting that the absence of such a claim, and the close relationship of the evidence to an empirical fact in issue, was dispositive. Likewise, in <u>*Schmerber, supra*</u>, Justice Brennan predicted potential conflicts by pointing out that the distinction between corporeal and testimonial evidence may, at some future time, begin to blend and that *"there will be many cases in which such a distinction is not readily drawn."* *Id.* 764. Here, Defendant has fully asserted the claim that is absent in all other exemplar cases ever to appear in the State and Federal Courts. It is abundantly clear that by application of the well defined rationale expressed in <u>*Schmerber, supra*</u>, and every other exemplar or corporeal evidence case decided by the Supreme Court, <u>the order compelling Defendant to provide this evidence should be construed to be a violation of the privilege.</u> This fundamental distinction was, and continues to be, disregarded by New York's highest Court and should provide a basis for preclusion here.

The next question to be addressed is whether compelling Defendant to reveal, under the guise of the corporeal evidence exception, the expressive tattoos, the Trial Court *"extorted a communication"* from Defendant. Guidance on this question can be found in this Court's holding in <u>*Holt v. US.,*</u> 218 U.S. 245, 252-253 (1910), wherein the Court ruled

*"...but the prohibition of compelling a man in a criminal Court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an*

19

10, 211.

...ture from this well settled precept and impermissibly

...monial evidence, by judicial edict, directly from an

... the Fifth Amendment's self-incrimination clause.

...nt, logically consistent and straightforward arguments,

...oomed before the Court of Appeals, to wit: respecting

... privilege, can the State compel testimonial evidence

... him or her in a criminal trial?

... obtained from Defendant was communicative and

... this Court. In *Doe v. U.S.,* 487 U.S. 201, 210 *(1988)*

...hat which *"reveals a person's subjective knowledge or*

...*t least in part, was designed to spare an accused*

...*eliefs with the government. Id.* 213, or evidence that

...*ertion, discloses information or that which reveals the*

...en discussing this issue the Supreme Court has also

...which the evidence is presented. Defendant contends

...ns mirror those of Defendant insofar as the relevancy

...mply, evidence that is offered in a communicative

...lish a thought or belief as opposed to an empirical fact

... U.S. 424, 456, 436 (1971).

...*"* offered in a *"communicative context"would*

...ption, violate the privilege. This well settled

...: majority at New York Court of Appeals.

21

---

*exclusion of his body as evidence when it ma...*

*forbid a jury to look at a prisoner and compare ...*

added).

In *Holt,* the exhibition of the Defenda...

legitimate use of corporeal evidence, not to est...

Moreover, it cannot be logically or constituti...

any other corporeal evidence case for that ma...

State's desire to establish an accused's subject...

partially relying on *Holt,* the majority at th...

distinction and misapprehended the Supreme C...

*"real or physical evidence"* from that which ...

through an exercise in circular reasoning tha...

somehow justify its conclusion that it is co...

evidence, necessary to prove an incorporea...

exception as justification for its forcible extra...

violates both the spirit and history of the privil...

In all of Supreme Courts prior determin...

restricted to those times when the physical char...

just that, the accused's physical person. Whethe...

or dexterity *[Pennsylvania v. Muniz,* 496 U.S.5...

voice, *[US. v. Dionisio,* 410 U.S.1, (1973)]*, or...

relevancy and materiality of the evidence has al...

*physical characteristic for identificationpurpos...*

Importantly, in this case, the New York Court of Appeals recognized the evidence to be testimonial in nature and offered in a communicative context, but then turned to *Hubbell, supra,* to excuse the State's actions, avoid suppression and circumvent the privilege. This is the crux of the conflict.

Here, despite finding the evidence to be testimonial and communicative, the New York Court of Appeals reasoned *"the issue thus becomes whether the privilege is implicated here because this particular "real or physical evidence" may have also reflected Defendant's thought process. In this regard, we consider it dispositive that there is no Fifth Amendment protection for the contents of preexisting documents. Indeed, it is a settled proposition that a person may be required to produce specific documents (in response to a subpoena) even though they contain incriminating assertions of fact or belief because the creation of those documents was not compelled within the meaning of the privilege. United States v. Hubbell, 530 US. at 35-36."*

Defendant's contention that the Court of Appeals' view of *Hubbell,* impermissibly decreased the Fifth Amendment's self-incrimination clause rests in part on the assertion that, once offered for the sole and particular purpose of proving the accused's subjective thoughts and beliefs, the evidence ceased to be *"real or physical"* evidence and was transmuted by its use, relevancy and materiality into *"testimonial evidence."*

The Defendant hastens to point out and emphasizes that, since the tattoos were <u>never</u> relevant or material to any corporeal matter, the corporeal evidence justification underlying the Trial Court's order that permitted the forced gathering of it was <u>never</u> constitutionally authorized. Accordingly, Defendant contends that the New York Court of Appeals' entire paradigm is conceptually flawed, ill conceived and unconstitutional. <u>This assertion provides further support *vis a vis* a fundamental defect that renders the trial below ill suited for use in this</u>

22

summary proceeding.

From as early as *Boyd v. U S., 116 U. S. 616, 635 (1865)* this court has repeatedly warned "*Those who framed our Constitution and the Bill of Rights were ever aware of subtle encroachments on individual liberty. They knew that illegitimate and unconstitutional practices get their first footing—by silent approaches and slight deviations from legal modes and procedure.*" This case demonstrates the ease and stealth by which recognized liberties can be shrewdly dispensed with.

In their brief to the New York Court of Appeals, the People introduced the "act of production doctrine" by equating the Defendant's body to a pre-existing subpoenaed record or document. This assertion, while acknowledging the testimonial nature of the evidence, muddled an already murky question resulting in the awkward reasoning appearing in the lower Court's majority opinion.

Ignoring for the moment the fact that the questioned evidence was obtained by employing the corporeal evidence exception, the cases relied on by the People and the Court below are inapposite to the question presented and the facts of this case. The Defendant contends that by contorting *Hubbell* , the New York Court of Appeals has decreased the privilege as it applies to the natural individual and violates the edict of *Holt, Schmerber, Gilbert,* and *Wade.*

Initially, Defendant notes that the analogy drawn by the majority is without precedent. Never before has the rationale employed by the Federal and Supreme Courts in *Hubbell* been applied to the physical person or natural individual, so as to peiniit the coerced extraction of testimonial evidence directly from one accused of a crime. The Defendant contends the Court of Appeals opinion  set a dangerous precedent, one that is entirely inconsistent with any previous

23

interpretation of *Schmerber, Hubbell,* or the Fifth Amendment for that matter. Defendant likewise contends that even if this Court was to accept the reasoning employed by the New York Court of Appeals, effectively reducing the individual to the status of subpoenaed business records or tax returns, even then, and by properly applying the doctrine, the evidence would still remain Fifth Amendment protected.

Since the time of *Boyd v. U.S.* 116 U.S. 616 (1886) continuing through *U.S v. Shapiro,* 355 U.S.1 (1948), *Curcio* v. US., 354 U.S. 118 (1957), *Kastigar v. US,* 406 U.S 441 (1972), *Bellis v. US.,* 417 U.S. 85 (1974) and culminating in *Fisher v. U.S.,* 425 U.S. 391 *(1976), Doe v. U.S.,* 487 U.S. 201 (1988) and *US. v. Hubbell,* 530 U.S. 27 (2000), this Court has sought to define the language appearing in the Fifth Amendment's self incrimination clause which protects the citizenry against being incriminated by their own compelled testimonial communications. A review of the opinions leading up to *Hubbell* results in the following theoretical amalgam which captures the essence of the privilege and the act of production doctrine:

*"It is the extortion of information from the accused, the attempt to force him to disclose the contents of his own mind that implicates the self incrimination clause and unless some attempt is made to secure a communication, written or oral or otherwise upon which reliance is to be placed as involving the accused consciousness of the facts and the operations of his mind in expressing it, the demand is not a testimonial one. "*(Citations omitted). *Doe v. US.,* 487 U.S. 201, 211 (1988).

By application of this standard, and remembering the photos were of the Defendant himself not documents relating to some artificial entity, triggering the privilege is logically unavoidable. *Braswell v. US.,* 487 U.S. 99, 117, 118 (1988).

Most frequently, this debate has been limited to those times when the government, by use of

24

a subpoena, has sought records and other documents that, while containing incriminating evidence, did not compel the individual to restate, repeat or affiun the truth of the contents or authenticity of the documents sought and therefore, the Fifth Amendment was not violated *"for the privilege protects a person only against being incriminated by his own compelled testimonial communications"*. *Fisher v. U.S., 425* U.S 391, 407 (1976).

Here, there are two views supporting the Defendant's contention regarding the act of production doctrine's applicability to this matter. First, by compelling the Defendant to disrobe for the purpose of creating testimonial evidence (the photos), the Trial Court forced Defendant to do more then deliver evidence, it forced him to participate in the creation of evidence. These photos, taken over objection and under the threat of force, were only realized by a coercive edict that required Defendant to strip for this purpose and this purpose alone. Taken together with the fact that the images, symbols and words appearing on the Defendant's body are, as the term was defined in *Doe, supra* testimonial, the process described constitutes the creation, and extortion, of testimonial evidence. As for their use, there is no question that the photos were offered for their testimonial value and in a communicative context as opposed to *a "mere physical characteristic for identification purposes"*. *U. S. v. Wade, supra* at 222.

The second view is, by compelling the Defendant to reveal the expressive tattoos, the Trial Court forced Defendant to restate, repeat and affirm their purported sentiments. Since the evidence was admitted at Defendant's trial for the sole purpose of establishing his <u>current</u> beliefs, the forced display of the tattoos, which had been affixed <u>years</u> earlier, were of unknown vintage and hidden from public view, served as an affirmance, or restatement of their contents on both the day the photos were taken and when they were introduced against him at trial. Moreover, they were, as a matter of record, introduced for that precise purpose, to attribute the sentiments

25

expressed in the tattoos to the accused, <u>at trial.</u> Likewise, the Defendant contends that under these facts there is no way to divorce his testimonial capacities from either the gathering of the evidence or its contents. The mere fact that the evidence was introduced for the sole purpose of attributing to him the beliefs reflected in the tattoos to Defendant, renders the forced display of them, at several levels, a coerced assertion of fact or belief. Here, the photos were of the accused himself, making the testimonial compulsion self-evident and the only difference between what happened here and the forced stripping of the accused in open Court, is an imagined one. No distinction can be made between forcing the accused to orally restate a coerced confession in open Court and the facts of this case. This, Defendant contends, presents the substantial threat of self incrimination necessary to activate the privilege.

By holding that "*However much the tattoos may have reflected the Defendant's inner thoughts, the people did not compel him to create them,*" the Court of Appeals acknowledges the testimonial nature of the evidence but circumvents the privilege as set forth in <u>*Schmerber*</u> by misapplying the act of production doctrine as restated in <u>*Hubbell.*</u> However, unlike the cases relied, here, the Defendant provided much more than a mere concession that the tattoos existed, he was forced to reaffirm and restate their contents by removing his clothing and displaying himself for the photographer. This dangerous precedent defies this Court's belief that "*It is the extortion of information from the accused himself that offends our sense of justice.*" <u>Fisher v. US,</u> 425 U.S. 391, 398 (1976).

At the Court of Appeals the People also contended (and the majority agreed) that the tattoos constituted a "prior statement" made at the time a particular tattoo was affixed. Defendant answered that considering their age, location (intimate parts of the body), and the fact that they were covered by clothing and hidden from public view, the judicially coerced removal of the

26

clothing which hides them, constituted an independent compelled testimonial act. These facts, standing alone, deliver all that is necessary to implicate the privilege and overwhelm the State's anemic view of the doctrine upon which they rely.

In *Fisher, supra* the Supreme Court noted that: *"the elements of compulsion are clearly present, but the more difficult issues are whether tacit averments of the taxpayer are both testimonial and incriminating for the purpose of applying the Fifth Amendment."* Importantly, the Court continued *"these questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof" Id 410*. In this case, the purpose behind the compelled display was to ascribe a current testimonial statement to the Defendant at trial, thereby violating the underlying principles that support the act of production doctrine as well as the Fifth Amendment's self-incrimination clause. It is submitted that, considering the age, location, and content of the images, acronyms and symbols, their display constituted a forced and explicit testimonial act, not a harmless or tacit averment as to whether or not they exist. *Fisher v. US., 425 U.S.* at *410, 411.*

Under these facts, the compelled display of Defendant's body in order to provide testimonial evidence violated the privilege under *Schmerber* and the act of production doctrine as set forth in *Hubbell.*

A related proposition that deserves attention is the Supreme Court's repeated affirmation that, *"one of the several purposes served by the constitutional privilege against compelled testimonial self-incrimination is that of protecting personal privacy" Fisher v. U.S., supra* at 399.

The rationale employed by the New York Court of Appeals, which equates the stripping and photographing of the individual with a corporate document or business record obtained by

27

subpoena, not only decreases the sanctity of the privilege but also the individual. The authority is legion that distinguishes the *person* of the accused and the workings of his mind from his papers and records. For instance in *U.S. v. White, 322* U.S. at *648,* this Court declared *"The privilege is a personal one... applying to natural individuals designed to prevent legal process from forcing from the accused evidence necessary to convict him or compelling him to authenticate documents or effects that might incriminate him"* and that these principles construct a barrier against *'physical torture and less reprehensible modes of compelling evidence"* and form *a bulwark against inquisitous methods of prosecution."* The opinion relied on by Plaintiffs' abandons this fundamental concept.

In the view of the New York Court of Appeals, the State, by the issuance of a simple subpoena *deuces tecum,* can now, without exception or immunity, forcibly extract testimonial evidence directly from one accused of a crime. This is the bottom of the slippery slope. What is seen here is the People's successful attempt to avoid the strict standards of *Schmerber/ Gilbert/ Wade* by employing the relaxed standard expressed *in Hubbell and Fisher,* which was only accomplished by reducing the natural individual to the status of a business record or other inanimate object. It is submitted that the mere existence of a rule that is particular to records and documents should be recognition enough of the distinction between *people,* and the documents they, or others, may possess. The opinion relied upon by Plaintiff's fails to account for this historical distinction and reveals a failed experiment that crossbred *Schmerber* and *Hubbell* to the detriment of the privilege and the sanctity of the individual. *Braswell v. US.,* 487 U.S 99, 117, 118 (1988).

Even in cases that concerned the delivery of documents, Courts have gone to great lengths to reaffirm the importance of preserving *"inviolate the privilege against compulsory self*

28

incrimination" by declaring the privilege *"an intimate and personal one which respects the private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self condemnation."* <u>Couch v. u.s,</u> 409 U.S. 322, 327-329 (1975), <u>Doe v. U.S.,</u> 487 U.S. 201, 210-215 (1988).

Recognizing the abhorrence of governmental assaults upon the *individual,* the Courts have often warned against the temptation to resort to the *"cruel expedient of compelling incriminating evidence"* *[Couch v. U.S., supra,* <u>US v. White,</u> 322 U.S. 684, 698 (1944)], and that the privilege *"is as broad as the mischief against which it seeks to guard."* <u>Schmerber v. California,</u> 354 U.S. *757, 764* (1966), citing <u>Counselman v. Hitchcock,</u> 142 U.S. 547, 562 (1892).

The Court of Appeals' willingness to overlook a century of squarely applicable case law pertaining to corporeal evidence, favoring the <u>*sub silentio*</u> creation of a new exception to the Fifth Amendment, by the misapplication of an existing one, is as misguided as it is dangerous.

### OTHER REASONS FOR DISREGARDING<br>THE CONVICTION AS A BASIS SUMMARY<br>JUDGMENT

In the dissent below, Judge Ciparick and Chief Judge Kaye identify an accompanying Sixth Amendment violation that was perpetrated upon the accused at the time of his arrest. It is in this context that the following is submitted for the Court's consideration.

The Defendant, at the time he was presented to the office of the District Attorney, was accompanied by retained counsel who verbally, and in writing, advised the authorities that Defendant was invoking his various Fifth Amendment protections and that any evidence could only be gathered by operation of N.Y.C.P.L. 240.40 (2)(b)(iv). Mentioned earlier, this statute, mirroring this Court's corporeal evidence exception, provides a mechanism whereby the people can obtain, upon motion, and <u>"subject to constitutional limitation"</u>... <u>"non-testimonial"</u> evidence

29

such as hair, blood, voice exemplars, handwriting samples, fingerprints and photos.

Notwithstanding the admonishment by counsel regarding exemplars, the Prosecutrix, while still within the confines of the District Attorney's office, forced the accused, over his objection, to strip for the purpose of photographing the tattoos which appear on his body. The photos were then submitted to the grand jury for their testimonial and communicative value, not as real or physical evidence. The Defendant contends that this forced display, coyly and shrewdly conducted after counsel had departed and over his objection, constituted the impermissible extraction of testimonial evidence in contravention of Defendant's Sixth Amendment right to counsel.

There are several separate and distinct constitutional questions which emanate from these facts. First, if the evidence sought and obtained during this procedure is determined to be testimonial, then it logically follows that the process described constitutes a patent violation of both the accused's Fifth Amendment right to remain silent and his Sixth Amendment right to counsel, both of which were asserted, in writing, prior to the Defendant being taken into custody.

This contextual wrinkle compels an even deeper discussion of the Fifth Amendment and its relationship to the Sixth Amendment. Moreover, it is apparent that this sub-plot was equally important to the Court of Appeals below and pointed to by them as a way of quelling the Fifth Amendment claims advanced by the Defendant. The decision relied upon by Plaintiff's suggests that, since the evidence was gathered in a manner consistent with the Fourth Amendment, Defendant's Fifth and Sixth Amendment claims were thereby trumped. Defendant disagree.

In the Courts majority opinion, the New York Court of Appeals states *"even if as the dissent contends, the trial Court erroneously authorized the taking of the second set of photographs, defendant suffered no prejudice as a result because.... the first set of photographs would have been admissible at trial."* Regardless of whether the evidence was obtained without violating the

Fourth Amendment, the process described constitutes the compelled extraction of *"testimonial evidence" [Couch v. U.S.,* 409 U.S. 322, 327-328 (1975); *Doe v. U.S.,* 487 U.S. 201, 209-211 (1988)] and is therefore unconstitutionally obtained and inadmissible at trial by operation of the Fifth Amendment's right to remain silent, the self-incrimination clause and the Sixth Amendment's right to counsel. Since both the ingredient of compulsion, as well as the *"testimonial nature" of that* which was sought and obtained are present, the Court of Appeals' analysis is flawed, replete with rationalizations and creates a variety unforeseen constitutional entanglements. *Dawson v. Delaware,* 503 U.S. 159 (1992); *Miranda v. Arizona, infra.*

Notwithstanding the Court of Appeals' questionable Fourth Amendment analysis, the real issue is whether or not the Defendant's Fifth and Sixth Amendment protections were transgressed by this post-arrest, pre-arraignment, coerced gathering of testimonial evidence. The Defendant contends that, under these facts, there is no constitutional distinction between the coerced extraction of testimonial evidence by forcing an accused to strip for the purpose of obtaining the evidence and the forced extraction of an oral admission outside the presence of counsel.

Even if, arguendo, the forced strip was constitutionally peimissible from a Fourth Amendment perspective, this can not overcome the Fifth and Sixth Amendment contentions The fact remains that the evidence was compelled from him and it was both testimonial and communicative. For brevity's sake, the Defendant emphasizes that: 1) the forced strip, over objection, was nothing like a routine booking procedure; 2) that the process described was more akin to a forced confession obtained outside the presence of counsel than a routine booking and 3) even if the strip was authorized by the Fourth Amendment, the gathering of testimonial evidence remains prohibited by operation of the Fifth and Sixth Amendments and should therefore have been excluded from use at trial. *Estelle v. Smith,* 451 U.S. 454, 470-473 (1981).

31

> *Miranda v. Arizona,* 384 U.S. *436, 439* (1966), the Supreme Court held *"The cases*
> *before us raise questions which go to the roots of our concepts of American*
> *criminal jurisprudence.., we deal with the admissibility of statements obtained from*
> *an individual who is subjected to custodial police interrogation and the <u>necessity</u>*
> *<u>for procedures which <u>assure that the individual is accorded his privilege</u> <u>under the</u>*
> *<u>Fifth Amendment to the Constitution not to</u> <u>be compelled to incriminate himself"</u>*
> (Emphasis added).-473 (1981).

The case before this Court also challenges the historical definition of testimonial evidence as seen in cases like *Hubbell* and *Fisher, supra,* with the constitutional doctrines encompassed by *Miranda* and its progeny. Cutting directly to the point, if testimonial evidence is that which has been defined *in Doe, Hubbell,Schmerber, etc.,* the question becomes, did law enforcement, by forcibly stripping the Defendant for the sole purpose of obtaining testimonial evidence, violate his Sixth Amendment protections as provided for in *Miranda.* This question, although easily framed, is not so easily answered.

If, Sixth Amendment violations exist when the government, after the accused has invoked his right to counsel, *"deliberately elicits incriminating statements" [U.S. v. Henry,* 447 U.S. 264 (1980)], then it would logically follow that the testimonial evidence forcibly obtained at the time of his arrest would have been suppressed by operation of the Defendant's Sixth Amendment protections as well as his Fifth Amendment rights and privileges. Accordingly, the lower Court's reliance, on the "first set of photos" as justification for the second set, is equally misguided.

That *"no person shall be compelled in a criminal case to be a witness against himself and that the accused shall...have the assistance of counsel"* are rights that were *"fitted in our constitution after centuries of persecution and struggle and were secured for ages to come,,.*

32

*designed to approach immortality as nearly as human institutions can approach it."* *Cohens v. Commonwealth of Virginia,* 6 Wheat. *264, 387* (1821). In this case, what was thought to be enshrined with the *"impregnability of a constitutional enactment"* has been marginalized and quietly dispatched. *Brown v. Walker,* 161 U.S. *591, 596-597* (1896). Therefore, the Defendant contends that there exists ample reason to disqualify the criminal conviction a dispositive of the issues raised herein.

The question now becomes: can any trial so tainted with pervasive constitutional error be called a fair one. The Fourteenth Amendment's free standing right to a fair trial was a casualty the State was willing to accept in order to obtain a conviction and the Appellate Courts were willing to overlook in order to preserve one.

Historically, the Supreme Court has repeatedly concluded that there exists a class of constitutional rights so basic to a fair trial that their infraction can rarely be treated as harmless error. *Chapman v. California,* 386 U.S. 18, *21, 23* (1967). Among these sacrosanct privileges are the Fifth Amendment's right to remain silent, protection against coerced self incrimination and the Sixth Amendment's right to counsel, all of which are the subject of this Petition.

Since the commencement of this criminal proceeding there has been a pervasive pattern of excuses, justifications, and rationalizations, seemingly engineered to deprive the Defendant the fundamental protections enunciated in the Bill of Rights. Perhaps, this was the result of the Defendants unpopular beliefs or maybe the by-product of notoriety or even the political pressures that invaded the trial. Whatever the source, the belief that Defendant was not entitled to constitutional protection metatastisized.

In *Chapman, supra,* this Court concluded by remarking *"such a machine gun repetition of a denial of constitutional rights, can no more be considered harmless then the introduction against*

33

a *Defendant of a coerced confession. "Id.* 26. By application of this standard to the facts of this case, the standard that a litigant be provided a *"fair opportunity"* to litigate has not been observed.

### Questions regarding the admissibility of evidence

### Relating to body markings are properly before the

### Court.

In their memorandum of law the Plaintiffs' rely almost exclusively on the New York Court of Appeals' description of the tattoos that appear on Defendant, Christopher Slavins' body. Importantly, in the decision relied upon by the Plaintiffs', the dissent points out that aside from this illegitimate and irrelevant evidence the record was devoid of <u>any</u> evidence *vis a vis* a racial or religious motive [*People v. Slavin*, 1 N.Y.3d 392 (2004)].

Now Plaintiffs' seek to contaminate this tribunal with the same evidence. Defendant submits that based upon the following arguments the evidence should be precluded as a matter of law.

In answer to Plaintiff's assertion *vis a vis* relevancy it is submitted that despite placing importance on the tattoos as admissions or statements" (conceding their communicative value and testimonial nature) Plaintiffs' argument provides compelling support for Defendant's trial contention that there is <u>no</u> theory available that permits the introduction of this evidence. If it is assumed <u>*arguendo*</u> that a tattoo is a "*statement made contemporaneous with its application*" (the theory relied upon by the Court of Appeals) how then can a statement made seven (7) or even (10) years prior to the crime date, not be considered temporally remote and therefore irrelevant. Likewise, they (the tattoos) are also "*logically remote*" and as such are irrelevant [*Tot v. U.S.*, 319 U.S. 463 (1943).

34

By conceding the images in question are communicative and testimonial statements, the Plaintiffs, aside from squarely implicating Defendant's Fifth Amendment privilege and Sixth Amendment right to counsel, have subjected themselves to Defendant's "*inference within an inference*" reasoning raised at trial and rejected by the Court of Appeals [ *U.S. v. Ross, infra*].

The logical analysis advanced by Defendant at trial, closely follows ancient law and legal theory that dates as far back as the mid-1800's when, by Chief Judge Denio in *People v. Kennedy*, 32 N.Y. 141, 146 (1865), the New York Court of Appeals held that "*circumstantial evidence, I repeat, consists in reasoning from facts that are known or proved, to establish such as are conjectured to exist, but the process is fatally vicious if the circumstances from which we seek to deduce the conclusion depends itself upon conjecture*" (emphasis added).

In *People v. Razeziez*, 206 N.Y. 249, 270 (1912), the New York Court of Appeals, borrowing from the Supreme Court in *U.S. v. Ross*, 92 U.S. 281, noted that "*they are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at conclusions of fact is generally, if not universally inadmissible. No inference of fact or law is reliable, drawn from premises, which are uncertain. Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved and not themselves presumed...it is upon this principle that Courts are daily called upon to exclude evidence as too remote for the consideration of a jury*" Therefore, the Plaintiff's assertion insofar as relevancy is concerned should be rebuked[8]. According to *Ross*, which has been adopted in New York by *Razeziez*, the photos should have been excluded as irrelevant. Quite simply, in order to arrive at the conclusion that the tattoos are relevant, three separate and distinct inferences must be made. First, one must infer that the motive behind being tattooed was, to the exclusion of all other

---

[8] It should be noted that throughout the Plaintiff's submission the terms "*motive*" and "*intent*" are used interchangeably. This, I submit, is a dangerous proposition.

35

explanations, the self identification with certain supremacist ideologies as opposed to say gang membership, peer pressure, drunkenness or even a temporary and passing fascination with an outlaw counter culture.[9] One must then infer that the ideology, one arbitrarily assigned by the Plaintiff, somehow provides motive and intent for an act that occurred <u>at least</u> twelve years later. Then one is asked, by yet a third inference, to assume that Plaintiff still subscribes to the purported beliefs that form the basis of the first inference. This *"inference within an inference"* scenario and renders the conclusion that the tattoos demonstrate motive and intent pure speculation and, as a result thereof, the evidence is irrelevant [*U.S. v. Ross*, 92 U.S. 281 (1875).

**WHEREFORE**, the Court should deny the motion in is entirety together with such other and further relief as this Court deems just, proper and equitable under the circumstances.

DATED:  December 28, 2004                    Respectfully Submitted,
         Huntington, New York

**ROBERT J. DEL COL, ESQ.**

**34 Dewey Street**

**Huntington, New York 11743**

---

[9] On point is that the expert, named by Plaintiff, testified as to reasons other than those attributed to the Defendant for the existence of these tattoos.

COUNTY COURT : SUFFOLK COUNTY

-----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

     -against -

CHRISTOPHER SLAVIN and
RYAN D. WAGNER,

       Defendants.

-----------------------------------------------------------------------X

                                   **INDICTMENT**

                                  Case Number 2452-A/B-00

| | | |
|---|---|---|
| VF | COUNT ONE: | ATTEMPTED MURDER IN THE SECOND DEGREE |
| VF | COUNT TWO: | ATTEMPTED MURDER IN THE SECOND DEGREE |
| VF | COUNT THREE: | ASSAULT IN THE FIRST DEGREE |
| VF | COUNT FOUR: | ASSAULT IN THE SECOND DEGREE |
| | COUNT FIVE: | AGGRAVATED HARASSMENT IN THE SECOND DEGREE |
| | COUNT SIX: | AGGRAVATED HARASSMENT IN THE SECOND DEGREE |

*Pamela M. Borock*
PAMELA M. BOROCK
FOREPERSON

BETTY ANN CAPUTO
ACTING FOREPERSON                    JAMES M. CATTERSON, JR.
OCTOBER/NOVEMBER, 2000, GRAND JURY IB DISTRICT ATTORNEY
TERM XI                             SUFFOLK COUNTY

## COUNT ONE

THE GRAND JURY OF SUFFOLK COUNTY, by this indictment, accuse the defendants, CHRISTOPHER SLAVIN and RYAN D. WAGNER, of the crime of Attempted Murder in the Second Degree, committed as follows:

The defendants, each acting in concert with the other person, on or about September 17, 2000, in Suffolk County, New York, with intent to cause the death of Israel Perez Arvizu, did attempt to cause his death.

## COUNT TWO

THE GRAND JURY OF SUFFOLK COUNTY, by this indictment, accuse the defendants, CHRISTOPHER SLAVIN and RYAN D. WAGNER, of the crime of Attempted Murder in the Second Degree, committed as follows:

The defendants, each acting in concert with the other person, on or about September 17, 2000, in Suffolk County, New York, with intent to cause the death of Magdeleno Estrada Escamilla, did attempt to cause his death.

## COUNT THREE

THE GRAND JURY OF SUFFOLK COUNTY, by this indictment, accuse the defendants, CHRISTOPHER SLAVIN and RYAN D. WAGNER, of the crime of ASSAULT IN THE FIRST DEGREE, committed as follows:

The defendants, each aiding the other, and acting in concert with each other, on or about September 17, 2000, in Suffolk County, with intent to cause serious physical injury to Israel Perez Arvizu, caused such injury by means of a dangerous instrument.

## COUNT FOUR

THE GRAND JURY OF SUFFOLK COUNTY, by this Indictment, accuse the defendants CHRISTOPHER SLAVIN and RYAN D. WAGNER of the crime of ASSAULT IN THE SECOND DEGREE, committed as follows:

The defendants, each aiding the other, and acting in concert with each other, on or about September 17, 2000, in Suffolk County, with intent to cause physical injury to Magdeleno Estrada Escamilla, caused such injury by means of a dangerous instrument.

## COUNT FIVE

THE GRAND JURY OF SUFFOLK COUNTY, by this Indictment, accuse the defendants, CHRISTOPHER SLAVIN and RYAN D. WAGNER, of the crime of AGGRAVATED HARASSMENT IN THE SECOND DEGREE, committed as follows:

The defendants, each aiding the other, and acting in concert with each other, on or about September 17, 2000, in Suffolk County, with intent to harass, annoy, threaten or alarm Israel Perez Arvizu, struck, shoved, kicked or otherwise subjected Israel Perez Arvizu, to physical contact, or attempted or threatened to do the same because of his race, color, religion or national origin.

## COUNT SIX

THE GRAND JURY OF SUFFOLK COUNTY, by this Indictment, accuse the defendant, CHRISTOPHER SLAVIN and RYAN D. WAGNER, of the crime of AGGRAVATED HARASSMENT IN THE SECOND DEGREE, committed as follows:

The defendants, each aiding the other, and acting in concert with each other, on or about September 17, 2000, in Suffolk County, with intent to harass, annoy, threaten or alarm Magdeleno Estrada Escamilla, struck, shoved, kicked or otherwise subjected Magdeleno Estrada Escamilla, to physical contact, or attempted or threatened to do the same because of his race, color, religion or national origin.

Exhibit B

AO 1/80) Summons in a Civil Action

**ORIGINAL**

CLERK
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

# United States District Court

EASTERN DISTRICT OF NEW YORK

2001 SEP 17 P 11: 33

ISRAEL PEREZ, MAGDALENO ESTRADA ESCAMILLA,
on behalf of themselves and all other Mexican/Chicano
Day Laborers and/or Latino Day Laborers similarly
situated,

Plaintiffs

**SUMMONS IN A CIVIL ACTION**

v.

POSSE COMITATUS, SHERIFF'S POSSE COMITATUS,
AMERICAN PATROL, THE CREATIVITY MOVEMENT,
NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC.,
WORLD CHURCH OF THE CREATOR, CHIRSTOPHER SLAVIN
and RYAN WAGNER,

Defendants

**CASE NUMBER:**

**CV 01 6201**

SEYBERT, J.

WALL, M.J.

TO: (Name and Address of Defendant)

SEE ATTACHED LIST OF DEFENDANTS LABELED ADDENDUM

YOU ARE HEREBY SUMMONED and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

LAW OFFICES OF FREDERICK K. BREWINGTON
Clinton Street, Suite 501
Hempstead, New York 11550

an answer to the complaint which is herewith served upon you, within ____20____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint.

ROBERT C. HEINEMANN

SEP 17 2001

_____    _____
CLERK                       DATE

_____
BY DEPUTY CLERK

## ADDEMDUM TO SUMMONS

1.    POSSE COMITATUS, P.O. Box 321 Ulysses, Pennsylvania, 16948. Said association's telephone number is 814-848-7945.

2.    SHERIFF'S POSSE COMITATUS, P.O. Box 321 Ulysses, Pennsylvania, 16948. Said association's telephone number is 814-848-7945.

3.    AMERICAN PATROL is an unincorporated association composed of white persons, which advocates hatred and intolerance against immigrants and day laborers.  It has been active on Long Island and has a close association with Sachem Quality of Life, another defendant to this action. The American Patrol is and at all times complained of 13547 Ventrua Blvd., Suite 163, Sherman Oaks, CA 91423. Said association's telephone number is (818) 501-2061.

4.    THE CREATIVITY MOVEMENT P.O. Box 2002, East Peoria, IL 61611. Said association's phone number is (309)-699-0135. The CREATIVITY MOVEMENT maintains its local chapter business addresses in the State of New York at P.O. Box 511, New York, NY 10116-0511, at P.O. Box 4162, New York, NY 10185, and at P.O. Box 843, Sleepy Hollow, NY 10591.    5.    NATIONAL ALLIANCE POB 90, Hillsboro, WV 24946. The NATIONAL ALLIANCE's phone numbers are (304) 653-4707 and (304)-653-4600.

6.    SACHEM QUALITY OF LIFE , INC., P.O. Box 767, Farmingville, New York 11738.  Said association's phone number is (631)-480-7124.

7.    WORLD CHURCH OF THE CREATOR, P.O. Box 2002, East Peoria, IL 61611. The WCOTC's phone number is (309)-699-0135.  The WCOTC maintains the business addresses of its local chapters in the State of New York at P.O. Box 511, New York, NY 10116-0511, at P.O. Box 4162, New York, NY 10185, and at P.O. Box 843, Sleepy Hollow, NY 10591.

8.    CHRISTOPHER SLAVIN, Hicksville, New York

9.    RYAN  WAGNER, Maspeth, New York

FILE COPY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CLERK
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

------------------------------------------------------------X
ISRAEL PEREZ, MAGDALENO ESTRADA ESCAMILLA,    2001 SEP 17  P 11: 34
on behalf of themselves and all other Mexican/Chicano Day
Laborers and/or Latino Day Laborers similarly situated,

**CV   01   6201**

Plaintiffs,                           **COMPLAINT**

-against-                             Docket No.

POSSE COMITATUS, SHERIFF'S POSSE COMITATUS,      **SEYBERT, J.**
AMERICAN PATROL, THE CREATIVITY MOVEMENT,
NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC.,
WORLD CHURCH OF THE CREATOR,
CHRISTOPHER SLAVIN and RYAN WAGNER,

Defendants.                          **WALL, M.J.**
------------------------------------------------------------X

## COMPLAINT FOR MONETARY DAMAGES

Plaintiffs, by and through their attorneys, THE LAW OFFICES OF FREDERICK K.
BREWINGTON, as and for their Complaint against Defendants allege as follows:

### PRELIMINARY STATEMENT

1.      This action is brought on behalf of plaintiffs, ISRAEL PEREZ (hereinafter "PEREZ")
and MAGDALENO ESTRADA ESCAMILLA (hereinafter "ESCAMILLA"), all Mexican/Chicano
Day Laborers and/or Latino Day Laborers similarly situated. Plaintiffs PEREZ and ESCAMILLA,
were attacked and seriously injured by the violent acts of defendants on the morning of September
17, 2000. Individual defendants and each one of them, supported, advocated, conspired, mislead,
trapped  and lured plaintiffs PEREZ and ESCAMILLA to an isolated warehouse. Along with the
use of force, violence, weapons, and other unlawful means, the individual defendants brutally
attacked PEREZ and ESCAMILLA and have created and will continue to create an imminent threat
of violence against Mexican/Chicano and Latino immigrants, in particular PLAINTIFFS, and will
continue to create a climate of fear and intimidation in violation of constitutionally and statutorily
protected rights of PLAINTIFFS.

2.      Upon information and belief, a number of associations, groups and organizations both

incorporated and unincorporated, have provided a support network and have aided, and upon information and belief continue to aid, Defendants CHRISTOPHER SLAVIN (hereinafter "SLAVIN") and RYAN WAGNER (hereinafter "WAGNER") in the violation of Plaintiffs' rights. These associations, groups and organizations include, but are not limited to, defendants POSSE COMITATUS, SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC. and WORLD CHURCH OF THE CREATOR. These associations, groups and organizations all of which promote hatred and intolerance against immigrants and day laborers, upon information and belief, provided DEFENDANTS SLAVIN and WAGNER with support and assistance, both material and ideological.

3.       Individually PLAINTIFFS seek compensatory and punitive damages for injuries resulting from the unlawful, intimidating and violent acts of defendants which resulted in the deprivation of their constitutional and statutory rights, and such other relief as is necessary to ensure that their constitutional and statutory rights and those of other users of the streets, by-ways, and public areas of the State of New York, are not further violated by defendants.

**JURISDICTION**

4.       Jurisdiction of this Court is invoked, under the First, Thirteenth, and Fourteenth Amendments to the Constitution of the United States, pursuant to Title 28 United States Code (hereinafter U.S.C.) § 1331 and § 1343, Title 28 U.S.C. § 1651, and Title 42 U.S.C. §§ 1981, 1985, 1986 and 1988. Plaintiffs further invoke the pendent jurisdiction of the Court to consider claims arising under the constitution and laws of the State of New York.

**PARTIES**

5.       ISRAEL PEREZ and MAGDALENO ESTRADA ESCAMILLA (hereinafter mutually referred to as "Plaintiffs") are, and were, at all times complained of, Mexican/Chicano Day Laborers, residing in or around the Village of Farmingville, County of Suffolk, State of New York.

6.       Plaintiffs' class are all similarly situated Mexican/Chicano and/or Latino Day Laborers who seek to be protected, and be shielded from future wrongful, violative, improper,

2

violent and criminal actions at the hands of persons and associations, groups and organizations such as defendants.

7.     Upon information and belief, POSSE COMITATUS is an unincorporated association composed of white persons which advocates race hatred, religious intolerance, white supremacy against Black people, Hispanics, and various minorities and religious groups. THE POSSE COMITATUS advocates hatred and intolerance against immigrants. Upon information and belief, the POSSE COMITATUS is and at all times complained of maintaining a business address at Posse Comitatus, P.O. Box 321 Ulysses, Pennsylvania, 16948. Said association's telephone number is 814-848-7945.

8.     Upon information and belief, SHERIFF'S POSSE COMITATUS is an unincorporated association composed of white persons which advocates race hatred, religious intolerance, white supremacy against Black people, Hispanics, and various minorities and religious groups. SHERIFF'S POSSE COMITATUS advocates hatred and intolerance against immigrants. Upon information and belief, the SHERIFF'S POSSE COMITATUS is, and at all times complained of, maintaining a business address at Sheriff's Posse Comitatus, P.O. Box 321 Ulysses, Pennsylvania, 16948. Said association's telephone number is 814-848-7945.

9.     Upon information and belief, defendant AMERICAN PATROL is an unincorporated association composed of white persons, which advocates hatred and intolerance against immigrants and day laborers. It has been active on Long Island and has a close association with Sachem Quality of Life, another defendant to this action. The American Patrol is and at all times complained of, maintaining a business address at 13547 Ventura Boulevard, Suite 163, Sherman Oaks, California 91423. Said telephone number is 818-501-2061.

10.     Upon information and belief, Defendant THE CREATIVITY MOVEMENT is an unincorporated association composed of white persons, which advocates race hatred, religious intolerance, and white supremacy against Black people, Hispanics, and various minority and religious groups. The CREATIVITY MOVEMENT also advocates hatred and intolerance against

3

immigrants, describing immigration as a "'Third World Invasion'... from Black, Brown, and Yellow countries." Said association is closely linked to the World Church of the Creator, another party to this action. The CREATIVITY MOVEMENT has chapters throughout the United States and in the State of New York. The CREATIVITY MOVEMENT is, and at all times complained of, maintaining its "World Headquarters" business address at P.O. Box 2002, East Peoria, IL 61611. Said association's phone number is (309)-699-0135. The CREATIVITY MOVEMENT maintains its local chapter business addresses in the State of New York at P.O. Box 511, New York, NY 10116-0511, at P.O. Box 4162, New York, NY 10185, and at P.O. Box 843, Sleepy Hollow, NY 10591.

11.     Upon information and belief, NATIONAL ALLIANCE is an unincorporated association composed of white persons which advocates race hatred, religious intolerance, and white supremacy against Black people, Hispanics, and various minorities and religious groups. THE NATIONAL ALLIANCE advocates hatred and intolerance against immigrants. THE NATIONAL ALLIANCE describes itself as "the nation's pre-eminent White Nationalist organization." The NATIONAL ALLIANCE is, and at all times complained of, maintaining a business address at POB 90, Hillsboro, WV 24946. The NATIONAL ALLIANCE's phone numbers are (304) 653-4707 and (304)-653-4600.

12.     Upon information and belief, the SACHEM QUALITY OF LIFE , INC. (Hereinafter "Sachem Quality of Life") is an incorporated association composed of white persons which advocates hatred and intolerance against immigrants, and in particular, day laborers.    Said association is closely linked with AMERICAN PATROL, another defendant to this action. The association also works closely with other organizations which advocate white supremacy and intolerance against various minorities and religions. Among other things, SACHEM QUALITY OF LIFE refers to the presence of day laborers on Long Island as an "invasion" and advocates the belief that immigration is part of a Mexican governmental plot to annex United States territories. SACHEM QUALITY OF LIFE is, and at all times complained of, maintaining a business address

4

at P.O. Box 767, Farmingville, New York 11738. Said association's phone number is (631)-480-7124.

13.     Upon information and belief, Defendant WORLD CHURCH OF THE CREATOR (hereinafter Defendant "WCOTC") is an unincorporated association composed of white persons, which advocates race hatred, religious intolerance, and white supremacy against Black people, Hispanics, and various minorities and religious groups. The WCOTC also advocates hatred and intolerance against immigrants, describing immigration as a "'Third World Invasion'... from Black, Brown, and Yellow countries." Said association, is closely linked to the Creativity Movement, another party to this action. The WCOTC has chapters throughout the United States and in the State of New York. The WCOTC is, and at all times complained of, maintaining a business address at P.O. Box 2002, East Peoria, IL 61611. The WCOTC's phone number is (309)-699-0135. The WCOTC maintains the business addresses of its local chapters in the State of New York at P.O. Box 511, New York, NY 10116-0511, at P.O. Box 4162, New York, NY 10185, and at P.O. Box 843, Sleepy Hollow, NY 10591.

14.     Upon Information and belief, defendants CHRISTOPHER SLAVIN (hereinafter "SLAVIN") and RYAN WAGNER (hereinafter "WAGNER") are, and were at all times complained of herein, white citizens of the United States, residing respectively in or about Hicksville, Long Island, New York, and Maspeth, Queens, New York. Defendants are sued individually.

## CLASS ALLEGATIONS

15.     Plaintiffs bring this action on their own behalf and, pursuant to Rule 23 (a) and Rule 23 (b) (2) of the Federal Rules of Civil Procedure, on behalf of the class of all Mexican/Chicano day laborers of New York, who have been or will be intimidated, discouraged, frightened, and/or deterred from the exercise of their constitutionally protected rights by the violent actions of the defendants. In their representative capacities, plaintiffs seek only equitable and injunctive relief for the class which they represent.

16.     This class action is properly maintainable under Rule 23, (b) (2) of the Federal Rules

of Civil Procedure in that the class is so numerous that joinder of all members is impractical: there are questions of law and fact common to the class: the claims of plaintiffs are typical of the claims of the class and the named plaintiffs will fairly and adequately protect the interests of the class.

17.    The actions of said defendants will, or have, deprived the PLAINTIFF class of their First, Thirteenth, and Fourteenth Amendment rights; the right to full and equal benefits of all laws and proceedings for the security of persons as is enjoyed by white persons as assured by 42 U.S.C. §1981; equal protection of the laws and of equal privileges and immunities under the law as assured by the Fourteenth Amendment and by 42 U.S.C. §1985. As a result, injunctive relief with respect to the class as a whole is appropriate and necessary.

18.    Plaintiffs will adequately protect the interests of the class in that they have counsel who are experienced in litigation of the type herein instituted and who are familiar with the applicable legal principles.

19.    The representative plaintiffs seek relief which is identical and compatible with that sought by other members of the class.

## STATEMENT OF FACTS

20.    Upon information and belief, prior to September 17, 2001 and including all times thereafter, defendants SLAVIN and WAGNER were subjected to and adopted the influences and ideologies of POSSE COMITATUS, SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, THE CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC. and WORLD CHURCH OF THE CREATOR. Through and by this influence, individual defendants were encouraged and felt empowered to perform the acts of violence against plaintiffs which violated the rights set forth herein.

21.    During the early morning of September 17, 2000, Defendants CHRISTOPHER SLAVIN AND RYAN WAGNER agreed, conspired and determined that they would terrorize and attempt to kill, and otherwise violate the rights of PEREZ and ESCAMILLA and other Mexican/Chicano Day Laborers.

6

22.     On this early morning, Plaintiffs PEREZ and ESCAMILLA were at their home located in the Village of Farmingville, County of Suffolk and State of New York.

23.     DEFENDANTS came across PEREZ and ESCAMILLA's roommate and friend, Mario Mendosa, and informed Mr. Mendosa that they needed some workers.

24.     While the DEFENDANTS stayed outside in their grey toned Ford Taurus, Mr. Mendosa entered into the PLAINTIFFS' home and asked if they wanted to work.

25.     The PLAINTIFFS believing the offer to be real, accepted the employment and went outside to meet the DEFENDANTS and acknowledge their willingness to work for wages. SLAVIN and WAGNER had no intentions to pay plaintiffs and were intending for them to perform whatever services they were to perform without the benefits of wages.

26.     At this time, Mr. Mendosa departed to the day laborer area at the 7-Eleven located nearby.

27.     Plaintiff PEREZ sat behind Defendant SLAVIN and plaintiff ESCAMILLA sat behind defendant WAGNER.

28.     Defendant SLAVIN asked plaintiffs PEREZ and ESCAMILLA if they were Mexican. ESCAMILLA and PEREZ replied in the affirmative.

29.     Defendants SLAVIN and WAGNER then asked plaintiffs PEREZ and ESCAMILLA if they wanted breakfast. The plaintiffs answered in the affirmative.

30.     Defendant WAGNER proceeded to drive the car to a Burger King in Farmingville which was closed upon their arrival.

31.     Defendant WAGNER then proceeded to drive the car to the Long Island Expressway, and exited same at Exit 64.

32.     Upon exiting the Long Island Expressway, defendant WAGNER parked the car at a 7-Eleven, for the purpose of obtaining coffee.

33.     Defendant WAGNER and PLAINTIFFS PEREZ and ESCAMILLA entered the 7-Eleven and purchased coffee while defendant SLAVIN stayed outside the 7-Eleven establishment

7

in the car.

34.    After defendant WAGNER and plaintiffs PEREZ and ESCAMILLA returned to and entered the car, defendant WAGNER proceeded to drive the car back towards the Long Island Expressway.

35.    During the drive, the defendants SLAVIN and WAGNER asked the plaintiffs PEREZ and ESCAMILLA if they liked beer, and they responded "no".

36.    Defendant SLAVIN then proceeded to talk of visiting Cancun, Mexico.

37.    Plaintiff ESCAMILLA then asked Defendant SLAVIN if it was difficult to obtain a driver's license in the United States, he said "not really".

38.    Defendant WAGNER proceeded to exit the Long Island Expressway at exit 68.

39.    In furtherance of their intent to violate plaintiffs' rights, defendants SLAVIN and WAGNER then took plaintiffs PEREZ and ESCAMILLA to an abandoned building.

40.    Defendant WAGNER drove the car along a path beside the building and stopped at a point where they were no longer able to proceed with the car because of a block in the road.

41.    Having captured and kidnaped plaintiffs, considering them prey, defendants SLAVIN and WAGNER set into motion their violent actions.

42.    Defendant SLAVIN along with plaintiffs PEREZ and ESCAMILLA got out of the car while Defendant WAGNER parked the car.

43.    Plaintiffs PEREZ and ESCAMILLA, along with defendant SLAVIN, walked back to where defendant WAGNER parked the car.  Defendant SLAVIN then proceeded to remove various tools from said car.

44.    Defendant SLAVIN gave plaintiff PEREZ a yellow shovel, and gave ESCAMILLA another shovel.  Defendant SLAVIN then removed a post hole digger from the same vehicle for himself.

45.    After removing the tools from the trunk of the aforementioned vehicle, defendants SLAVIN and WAGNER, individually and in concert, did unlawfully, intentionally, and did with

8

malice aforethought viciously attack, maim and attempted to kill Mexicans and other Latino day laborers, particularly plaintiffs PEREZ and ESCAMILLA, sought to, and did in violation of the law and in violation of plaintiffs' PEREZ and ESCAMILLA's rights, lured plaintiffs PEREZ and ESCAMILLA into the basement of the building in order to accomplish their unlawful goals.

46.    Defendant WAGNER, using his knowledge of the Spanish language as a ploy, led the plaintiffs PEREZ and ESCAMILLA to the basement of the building and distracted them by telling them that he wanted them to move certain mud out of the way. There was no specific discussion of payment for the work.

47.    Defendants SLAVIN and WAGNER left the plaintiffs PEREZ and ESCAMILLA to perform their supposed work assignment in order to go outside and plan the attack against plaintiffs.

48.    Approximately 5 minutes after the Plaintiffs began working, the brutal attack began.

49.    As Plaintiffs PEREZ and ESCAMILLA were working defendants SLAVIN and WAGNER entered the basement.

50.    Defendant SLAVIN came behind and viciously struck and hit plaintiff ESCAMILLA in the back of the head with the post hole digger, swinging the tool against ESCAMILLA's head.

51.    The force with which defendant SLAVIN swung the post hole digger was so great that it caused plaintiff ESCAMILLA to suffer a blow so severe that he lost consciousness and caused to suffer severe and permanent injury.

52.    Plaintiff PEREZ became extremely frightened as he thought that plaintiff ESCAMILLA was dead as a result of defendant SLAVIN's vicious blow. SLAVIN continued to repeatedly beat and batter ESCAMILLA with the post hole digger with the intent of ensuring ESCAMILLA's death.

53.    As PEREZ stood in shock and defenseless, watching his unconscious friend being beaten, defendant WAGNER charged toward him with a sharp knife, the blade of which, measured at least four or five inches in length. PEREZ, in great fear for his life, began to retreat backwards as the driver, defendant WAGNER, advanced on him with the knife in a stabbing posture with the

obvious intent of causing the immediate death of PEREZ.

54.     As defendant WAGNER stabbed at Plaintiff PEREZ with the knife, plaintiff PEREZ, in an act of desperation and protection, raised his work shovel to shield his body from defendant WAGNER's vicious armed attack.

55.     Defendant WAGNER, in a calculated attempt to injure PEREZ and end PEREZ's life, cut PEREZ'S right hand, causing him let go of the shovel.

56.     Defendant WAGNER then proceeded to cut PEREZ'S left hand as defendant SLAVIN continued to pummel plaintiff ESCAMILLA.

57.     Plaintiff PEREZ suffered severe injury to his hands and wrist, and suffered a great loss of blood.

58.     In fear for his life, PEREZ desperately tried to escape from the basement. WAGNER, in order to prevent plaintiff PEREZ from gaining his freedom, yelled to SLAVIN that PEREZ was trying to escape.

59.     Defendant WAGNER, with great force, then hit PEREZ then causing him to collapse to the ground. Trying to save his life, PEREZ attempted to get up, but was again attacked and hit in the left side of the head with the post digger held by SLAVIN.

60.     Fearing imminent death, plaintiff PEREZ cried out for help. Plaintiff ESCAMILLA, who was beginning to regain consciousness, was awakened by the terror filled screams of PEREZ, managed to get up and ran after SLAVIN with a shovel, for the purpose of protecting his friend from certain and impending death.

61.     Defendant SLAVIN then fled the scene while defendant WAGNER proceeded to chase after plaintiff PEREZ with his knife.

62.     Plaintiff PEREZ grabbed a stick in order to protect himself from WAGNER and the threat of the knife.

63.     Once again, plaintiff PEREZ then raised the stick in order to shield himself. Despite his desperate efforts, he was ultimately stabbed in the shoulder and wrist by defendant WAGNER.

10

Severely wounded, PEREZ dropped the stick and once again yelled, pleading for help.

64.     As WAGNER pursued PEREZ, plaintiff ESCAMILLA, in an attempt to prevent the continued deadly attack, came over and hit defendant WAGNER in the back with the post hole digger. WAGNER than fled the scene.

65.     Uncertain about the whereabouts of SLAVIN and WAGNER, plaintiff ESCAMILLA helped plaintiff PEREZ get up and the plaintiffs ran toward the Long Island Expressway in search of assistance.

66.     After being passed and ignored by numerous motorist, plaintiffs eventually were able to stop a car. In their shock and fear, plaintiffs tried to explain what had happened but because of the language barrier, the driver could not understand them.

67.     Clear to the facts that plaintiffs were victims, the driver of the car called the police on his cellular phone and waited until the police and ambulance arrived. The police called an interpreter and plaintiffs PEREZ and ESCAMILLA explained what happened as best as they could although they were extremely confused and in pain.

68.     The defendants acted with intent to prevent plaintiffs PEREZ and ESCAMILLA from exercising their rights; did unlawfully cause serious physical injuries and other harm; and intimidated the plaintiffs all in violation of constitutionally and statutorily protected rights because of their race and color of skin.

69.     On September 17, 2000 the defendants SLAVIN and WAGNER did swing the aforementioned shovel and post hole digger repeatedly striking plaintiffs PEREZ and ESCAMILLA, about their bodies causing serious physical injury. Also, defendant WAGNER stabbed PEREZ with the aforementioned knife in the shoulder, wrist, and hands causing serious physical injury. Said acts were intentional and racially motivated.

70.     Defendants SLAVIN and WAGNER acted in association and in furtherance of the aims and goals of anti-immigrant, and anti-day laborer organizations including but not limited to POSSE COMITATUS, SHERIFF'S POSSE COMITATUS AMERICAN PATROL, THE

11

CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC. and WORLD CHURCH OF THE CREATOR. Each of these groups perpetuated unlawful discriminatory acts and abuse and served as a catalyst and impetus for the actions of the INDIVIDUAL DEFENDANTS.

71.     Upon information and belief, defendants SLAVIN and WAGNER attended POSSE COMITATUS meetings and acted as instrumentalities and in association with the POSSE COMITATUS. Additionally, SLAVIN and WAGNER acted with the support of SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, THE CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC. and WORLD CHURCH OF THE CREATOR.

72.     The INDIVIDUAL DEFENDANTS and ORGANIZATIONS which transform their rhetoric into violative and illegal, violent, and criminal actions are not protected by the 1st Amendment as they seek to and do violated the rights of plaintiffs and the plaintiff class as defined herein.

**AS AND FOR A FIRST COUNT**
**(42 U.S.C. §§ 1981 and 1985)**

73.     Plaintiffs re-allege paragraphs 1 through 72 of the Complaint and said paragraphs are included by reference.

74.     That defendants SLAVIN and WAGNER did unlawfully intentionally, and did with malice aforethought swing said shovels, post hole diggers, and knife at plaintiffs, selecting said plaintiffs on account of their race and depriving plaintiffs of their First, Thirteenth, and Fourteenth Amendment rights, and statutory rights pursuant to 42 U.S.C. § 1981 and § 1985, including but not limited to the full and equal benefits of all laws and proceedings for the security of persons as is enjoyed by white persons, of the equal protection of the laws of equal privileges and immunities under the laws.

75.     That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESCAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some

of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

76.    That by reason of the foregoing, the Plaintiffs have been damaged in the sum of Three Million ($3,000,000.00) Dollars.

**AND AS FOR A SECOND COUNT**
**(42 U.S.C. § 1985(3))**

77.    Plaintiffs re-allege paragraphs 1 to 75 of the Complaint and said paragraphs are included by reference.

78.    The actions of the Defendants POSSE COMITATUS, SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, THE CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC., WORLD CHURCH OF THE CREATOR, CHRISTOPHER SLAVIN and RYAN WAGNER in conspiring, and in going on the streets, highways and by ways of the state of New York hiding their true identity and motives, for the purpose of depriving the Plaintiffs of the equal protection of the laws, and of equal privileges and immunities under the laws, were in violation of 42 U.S.C. § 1985(3).

79.    The defendants did enter into a conspiracy in violation of 42 U.S.C. § 1985 for the purpose of either directly or indirectly depriving the members of the class which plaintiffs represent of their constitutional rights under the First, Thirteenth, and Fourteenth Amendments to the U.S. Constitution, and of their statutory rights under 42 U.S.C. § 1981 and §1985 because of the race or color of the members of said class.

80.    The said conspiracy of the said defendants, which was entered into for the purposes of intimidating and creating a climate of fear within the Mexican/Chicano and Latino Communities of the state of New York, and the aforementioned overt acts in furtherance of said conspiracy, deprived plaintiffs and the class which they represent of the same right to peaceably and lawfully

13

traverse the public ways of the state of New York as is enjoyed by white persons in violation of 42 U.S.C. § 1981, the Equal Protection Clause of the Fourteenth Amendment, and the First Amendment to the United States Constitution; their right to be secure in their persons as guaranteed by the Fifth and Fourteenth Amendments; their right to be free from badges and incidents of slavery as guaranteed by the Thirteenth Amendment; their rights under 42 U.S.C. §1981 to be free from assault and battery motivated by racial prejudice; their rights under 42 U.S.C. § 1985 (3) to be free of conspiracies for the purpose of depriving them, either directly or indirectly, of the equal protection of the laws and of equal privileges and immunities under the laws.

81.     That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESACAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

82.     That by reason of the foregoing, the Plaintiffs have been damaged in the sum of THREE MILLION ($3,000,000.00) DOLLARS.

### AND AS FOR A THIRD COUNT
#### (42 U.S.C. § 1986)

83.     Plaintiffs re-allege paragraphs 1 to 80 and said paragraphs are included by reference.

84.     That defendants POSSE COMITATUS, SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, THE CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC., WORLD CHURCH OF THE CREATOR, CHRISTOPHER SLAVIN and RYAN WAGNER having knowledge of the aforementioned conspiracy to commit the aforementioned wrong acts and knowing that said acts were about to be committed, and having power to prevent or help prevent the commission of same, neglected or refused to do so, and

14

therefore are liable to plaintiffs under 42 U.S.C. § 1986 for all damage which said defendants by reasonable diligence could have prevented.

85.     That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESACAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

86.     That by reason of the foregoing, the Plaintiffs have been damaged in the sum of THREE MILLION ($3,000,000.00) DOLLARS.

**AND AS FOR A FOURTH COUNT**
**(United States Constitution First, Thirteenth and Fourteenth Amendments)**

87.     Plaintiffs re-allege paragraphs 1 to 83 and said paragraphs are included by reference.

88.     The defendants POSSE COMITATUS, SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, THE CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC., WORLD CHURCH OF THE CREATOR, CHRISTOPHER SLAVIN and RYAN WAGNER, by the actions described herein, deprived the Plaintiffs of their right to be free from the badges and incidents of slavery, protected by the Thirteenth Amendment of the United States Constitution, and of their right to interstate travel, protected by the Constitution.

89.     The actions of the Defendants described herein also deprived the Plaintiffs of their right to equal protection of the laws, guaranteed by the Fourteenth Amendment.

90.     The actions of the Defendants described herein deprived the Plaintiffs of their rights to free speech, free assembly and free association, protected by the First and Fourteenth Amendments of the United States Constitution.

15

91.     The actions of the defendants described herein deprived the plaintiffs of their right to be secure in their persons and property as guaranteed by the Fifth and Fourteenth Amendments; and of their right to personal dignity and integrity, guaranteed by, or implicit in, numerous provisions of the United States Constitution.

92.     That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESACAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

93.     That by reason of the foregoing, the Plaintiffs have been damaged in the sum of THREE MILLION ($3,000,000.00) DOLLARS.

### AND AS FOR A FIFTH COUNT
### (New York State Human Rights Law and Civil Rights Law Violations)

94.     Plaintiffs re-allege paragraphs 1 to 89 and said paragraphs are included by reference.

95.     The actions of the defendants POSSE COMITATUS, SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, THE CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC., WORLD CHURCH OF THE CREATOR, CHRISTOPHER SLAVIN and RYAN WAGNER described herein constituted intentional tortuous invasion of the plaintiffs' rights. In particular, these actions subjected all or some of the Plaintiffs to assault, battery, false imprisonment, and the infliction of grave mental distress by extreme and outrageous conduct against plaintiffs on account and because of their race.

96.     Defendants by their aforementioned actions, subjected Plaintiffs to deprivation of their rights under the Constitution and laws of the State of New York and engaged in violations of said laws, including but not limited to the following for which Plaintiffs invoke the pendant

16

jurisdiction of the Court:

New York Civil Rights law including, but not limited to §§ 40, 40-C; 40-d; 41; New York State Executive Law §§ 291; 197.

97.     That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESACAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

98.     That by reason of the foregoing, the Plaintiffs have been damaged in the sum of THREE MILLION ($3,000,000.00) DOLLARS.

## AND AS FOR A SIXTH COUNT
### (Intentional Infliction of Emotional Distress)

99.     Plaintiffs re-allege paragraphs 1 to 93 and said paragraphs are included by reference

100.    The defendants POSSE COMITATUS, SHERIFF'S POSSE COMITATUS, AMERICAN PATROL, THE CREATIVITY MOVEMENT, NATIONAL ALLIANCE, SACHEM QUALITY OF LIFE, INC., WORLD CHURCH OF THE CREATOR, CHRISTOPHER SLAVIN and RYAN WAGNER acted outrageously for their above-stated roles in the assault, battery, false imprisonment, and the infliction of grave mental distress by extreme and outrageous conduct upon Plaintiffs.

101.    The Defendants knew that their conduct would cause severe and extreme emotional harm to Plaintiff.

102.    Said harm did in fact occur in this case, in that the Plaintiffs were debilitated to the point where they still suffer from episodes of anxiety, anger, loss of sleep, and other impingement of the emotional growth process; to the extent that the Plaintiffs are in need of counseling by a

17

psychiatrist or similar health care provider.

103.    That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESACAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

104.    By reason of the foregoing, Plaintiffs have been damaged in the sum of THREE MILLION DOLLARS ($3,000,000.00).

### AS AND FOR A SEVENTH COUNT
#### (Battery)

105.    Plaintiffs re-allege paragraphs 1 to 98 and said paragraphs are included by reference.

106.    The defendants SLAVIN and WAGNER lacked any basis  to assault, batter, false imprison, and inflict  grave mental distress by extreme and outrageous conduct..

107.    The Defendants beat, punched, physically and mentally abused Plaintiffs PEREZ and ESCAMILLA and each of them, defendants SLAVIN and WAGNER wrongfully used physical force either directly or indirectly and none of them had permission or authority to batter and abuse the Plaintiffs at any time.  Said actions were intentional and aimed at injuring and causing Plaintiffs discomfort, humiliation and pain.

108.    That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESACAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary

18

activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

109.    By reason of the foregoing, Plaintiffs have been damaged in the sum of THREE MILLION DOLLARS ($3,000,000.00).

### AS AND FOR A EIGHT COUNT
### (Assault)

110.    Plaintiffs re-allege paragraphs 1 to 103 and said paragraphs are included by reference.

111.    The Defendants SLAVIN and WAGNER were either directly or indirectly involved in the beating, punching, physical and mental abuse of Plaintiffs PEREZ and ESCAMILLA without any justifiable cause, DEFENDANTS wrongfully used physical force and none of them had permission or authority to batter and abuse the Plaintiffs at any time.  Said actions were intentional and aimed at injuring and causing Plaintiff discomfort, humiliation and pain.

112.    That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESCAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

113.    By reason of the foregoing, Plaintiffs have been damaged in the sum of THREE MILLION DOLLARS ($3,000,000.00).

### AS AND FOR A NINTH COUNT
### (False Imprisonment)

114.    Plaintiffs re-allege paragraphs 1 to 107 and said paragraphs are included by reference.

115.    The Defendants SLAVIN and WAGNER were either directly or indirectly involved in the unlawful detainment beating, punching,  physical and mental abuse of Plaintiffs PEREZ and

19

ESCAMILLA without any justifiable cause, DEFENDANTS wrongfully used physical force and none of them had permission or authority to batter, abuse and falsely prevent the Plaintiffs from moving about against their own free will at any time. Said actions were intentional and aimed at injuring and causing Plaintiff discomfort, humiliation and pain.

116.    That by reason of in and in consequence of said assault, the Plaintiffs PEREZ and ESCAMILLA sustained serious bodily injuries with the accompanying pain and were rendered sick, sore, and bruised and sustained, among other injuries, lacerations to their heads and faces; that some of the said injuries may be permanent; that Plaintiffs PEREZ and ESCAMILLA, as a result thereof, for some time to were confined to their houses and have required medicines and medical attention and have been prevented and will be prevented from pursuing their usual and ordinary activities and have expended or incurred large sums and will be required to expend or incur further sums for medical and other attention.

117.    By reason of the foregoing, Plaintiffs have been damaged in the sum of THREE MILLION DOLLARS ($3,000,000.00).

### INJUNCTIVE RELIEF

118.    Upon information and belief, Defendants have engaged in a continuing pattern and practice of unjustifiably harassing, humiliating, assaulting, battering, and other acts and conspiracies calculated to deprive the Mexican/Chicano Day Laborers and /or Latino Day Laborers similarly situated of their rights as secured by the First, Thirteenth and Fourteenth Amendments and by 42 U.S.C. §§ 1981, 1985 and 1986, and by the Constitution and the laws of the State of New York, and will continue to do so unless restrained by this Court.

119.    Plaintiffs PEREZ and ESCAMILLA and others similarly situated have no adequate remedy at law. Plaintiffs PEREZ and ESCAMILLA and others similarly situated have suffered and will continue to suffer irreparable injury because of the unlawful acts of the Defendants.

WHEREFORE, Plaintiffs respectfully request the following relief:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

ISRAEL PEREZ, MAGDALENO ESTRADA
ESCAMILLA, on behalf of themselves and all
other Mexican/Chicano Day Laborers and/or
Latino Day Laborers similarly situated,

                              Plaintiffs,          **AFFIDAVIT OF SERVICE**

            -against-                              $0I$
                                                   Docket No.: CV-6201   $(SJF$

CHRISTOPHER SLAVIN AND
RYAN WAGNER,

                              Defendants.          **FILED**
                                                   IN CLERK'S OFFICE
-----------------------------------------------------------------x   U.S. DISTRICT COURT E.D.N.Y.

      STATE OF NEW YORK      }
                             } ss.                 ★    JAN 03 2005    ★
      COUNTY OF SUFFOLK      }

      JOHN F. RAIO, being duly sworn, says:        LONG ISLAND OFFICE

1.    I am not a party to the action, am over eighteen (18) years of age, and
      reside at Deer Park, New York.

2.    On December 30, 2004, I served the within Defendant's Memorandum
      of Law in Opposition to Plaintiffs Motion for Summary Judgment by
      depositing a true copy thereof enclosed in a post-paid wrapper, in an
      official depository under the exclusive care and custody of the U.S.
      Postal Service within New York State, to the address designated
      below:

      Thomas Liotti, Esq.
      600 Old Country Road-Suite 530
      Garden City, New York 11530

      Frederick Brewington, Esq.
      50 Clinton Street-Suite 501
      Hempstead, New York 11550
                                                   _____
                                                        JOHN F. RAIO

      **Subscribed and Sworn to before me**
      **On December 30, 2004**

KELLY M. RUSSO
Notary Public, State of New York
Registration #01RU6060169
Qualified in Nassau County
My Commission Expires Sept. 9, 20 06